UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAUL O'SULLIVAN,

PLAINTIFF,

vs.

AUTISM SERVICES, INC.

DEFENDANTS.

**VERIFIED COMPLAINT**

Civil Action No.

16-cv-484

Plaintiff, Paul O'Sullivan, alleges as follows:

## PARTIES

1. Plaintiff, Paul O'Sullivan, is a natural person with a place of residence at 424 Roesch Avenue, Buffalo, New York 14207.

2. Defendant, Autism Services, Inc., is a corporation with offices located at 4444 Bryant Stratton Way, Williamsville, New York 14221.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 and as conferred by 42 U.S.C. §§ 2000e to 2999e-17 (amended 1972, 1978, and by the Civil Rights Act of 1991, Pub. L. No. 102-166) and 20 U.S.C.A. § 1681.

4. Defendant is subject to the jurisdiction of this Court and venue is proper in this District pursuant to 28 U.S.C. § 1391 (b) as the acts and omissions giving rise to the claims in this complaint occurred within the Western District of New York.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

5. Plaintiff exhausted administrative remedies as a prerequisite to bringing this claim as follows:

6. On June 2, 2015, Plaintiff duly filed a complaint with the New York State Division of Human Rights which cross-filed Plaintiff's complaint with the Equal Employment Opportunity

1

Commission (EEOC).  This EEOC complaint was designated as EEOC Charge No. 16G-2015-02912.

7. On March 17, 2016, the EEOC mailed Plaintiff a Dismissal and Notice of Rights letter demonstrating that he has exhausted his administrative remedies.

## FACTUAL BACKGROUND

8. Plaintiff is a thirty (30) year-old Caucasian male.

9. Plaintiff resides in the State of New York and is a citizen of the same.

10. Defendant hired Plaintiff on October 9, 2012 as a Direct Support Professional (a "DSP").

11. Defendant is a corporation organized for the purpose of providing services to individuals with disabilities.

12. Defendant is subject to the Americans with Disabilities Act Amendments Act ("ADAAA") because it is a private employer that employs greater than fifteen (15) employees.

13. Upon information and belief, Defendant receives federal funds in the form of Medicaid.

14. Direct Support Professionals are organized and report to a Team Leader.  The Team Leader is a position below, and reports to, the Program Director at each of Defendant's locations.

15. As a DSP, the essential functions of Plaintiff's job required him to be a contributing member of the Day Program interdisciplinary team, to provide active treatment which focused on skill development and maintenance for each individual as indicated in that individual's Individual Plan of Care, and to take an active role in promoting independence community inclusion and productivity.

16. This required Plaintiff to review participant's Plan of Care and support participants in completing meaningful activities by providing active treatment and follow levels of supervision, complete documentation both timely and thoroughly, encourage participants to work to the highest level of independence by utilizing the least restrictive prompt, supporting participants in caring for the environment to maintain efficiency, maintain open communication with the team and provide support and ideas to the Team Leader for the development of new learning experiences and activities, provide transportation of individuals to and from Day Program as assigned, and to follow agency policies and procedures.

17. At times, Plaintiff was required to care for autistic individuals.  This care involved planning and monitoring activities for participants in controlled settings, seeing to the dietary and sanitary care

of the participants, attempting to redirect participants from dangerous or injurious behavior, and –when necessary- applying restraint to combative or dangerous outbursts of the participants.

18. Defendant trained the Plaintiff to do the foregoing in the performance of his job duties.

19. Plaintiff's job duties were typically in the "Enhanced Room" which is a room comprised of low-functioning participants who typically have multiple disabilities and/or violent behaviors.

20. Plaintiff initially worked at Defendant's South Long Street location in Williamsville ("South Long").

21. Initially, Defendant gave Plaintiff occasional, positive feedback regarding his work product. Plaintiff had few, if any, disciplinary actions taken against him.

22. In fact, Plaintiff's solutions to problems were recognized as beneficial to the participants in the Defendant's programs, both decreasing the number of behavioral incidents and generally improving the participants' mood and morale.

23. Plaintiff's work was noted for its positive impact by Veronica Federiconi, Defendant's Executive Director, during a visit to Plaintiff's work location.

24. In late August of 2014 Plaintiff went for an MRI scan.  That scan revealed that he had a growth in his brain that would require treatment.

25. Because of his condition, Plaintiff was unable to drive and must go to doctor's appointments.

26. As a result of this diagnosis, Plaintiff was placed on medication that made him fatigued.

27. These impairments substantially limited one more major life activity of the Plaintiff, including his ability to work.

28. The foregoing constituted the Plaintiff's record of disability.

29. The foregoing formed the basis of Plaintiff's disability under the Americans with Disabilities Act Amendments Act ("ADAAA").

30. Accordingly, Plaintiff requested a reasonable accommodation from Rachel Grubbs, Defendant's Program Director for the South Long location.

31. Those accommodation requests included: 1) that Plaintiff would not be required to drive vehicles for the Defendant; 2) leave to attend Plaintiff's doctor's appointments under the Family Medical Leave Act ("FMLA"); 3) that Plaintiff would be allowed to leave slightly earlier or arrive slightly later than his usual shift times so that he could use public transportation; and 4) that Plaintiff's reports would be double-checked by himself and other staff prior to final submission of those documents.

3

32. Grubbs was receptive to these accommodation requests and granted them.

33. This was the basis of a request for accommodation for Plaintiff's disability, and was also one form of notice to his employer regarding his disability.

34. Plaintiff also duly completed the paperwork to obtain leave under the Family Medical Leave Act ("FMLA") from the Defendant.

35. Such leave was formally granted by Defendant on September 2, 2014.

36. Subsequently, Plaintiff had a seizure at work that was related to his disability shortly before Thanksgiving in 2014.

37. This was also a form of notice of Plainitff's disability to his employer.

38. After this seizure, Defendant offered another reasonable accommodation that he would be accompanied by at least one staff member.

39. This was a request for an accommodation, and was another form of notice to Plaintiff's employer of his disability.

40. In February of 2015 Plaintiff transferred to the Defendant's Hertel location.

41. This location was closer to Plaintiff's residence and easier for him to avail himself of public transportation to get to work.

42. The Hertel location has separate staff from the South Long location.  The Direct Support Professionals at the Hertel location reported to Brian Wheeler, Respondent's Day Program Administrator for the Hertel location, and was in turn supervised by a separate Program Director as well.

43. After transferring to the Hertel location, Plaintiff quickly learned that he was no longer a Direct Support Professional with an individual room assignment, despite his understanding to the contrary prior to his transfer.

44. At Hertel, Plaintiff was demoted to a "Floater" which is an employee that would fill in as needed.

45. Despite this demotion, Plaintiff was made to understand that no other terms of his position had changed.

46. This demotion was an adverse action.

47. During the first week after his transfer to the Hertel location, Plaintiff also learned that his accommodations were revoked.

48. Wheeler requested that Plaintiff drive Defendant's vehicle to transport participants. Plaintiff stated that he could not drive the Defendant's vehicle.

49. Wheeler responded by asking Plaintiff to inform him when he could drive again, and asked Plaintiff to inform his Team Leader about "what was going on."

50. The foregoing was a revocation and denial by Plaintiff's employer of his previously granted reasonable accommodation for Plaintiff's disability.

51. In March of 2015 Plaintiff was called into Wheeler's office and disciplined for attendance issues. Plaintiff was issued a written discipline for coming in after his start time and leaving before his shift ended pursuant to Plaintiff's previous accommodation.

52. Additionally, Wheeler told Plaintiff that this was a "serious thing."

53. This discipline was an adverse action.

54. Plaintiff protested this discipline in writing informing Defendant of Plaintiff's FMLA leave, the affects of his disability including memory and concentration issues related to his medication, and that he was suffering from a serious medical condition.

55. Plaintiff's writing was answered by Christine Higgins, Defendant's Senior Director of Administration, on March 13, 2015.

56. Higgins indicated that the accommodation of flexible start and leave times was terminated because public transportation should no longer be an issue for Plaintiff based on his transfer to Defendant's Hertel location.

57. Higgins also indicated that this termination of accommodation was "miscommunicated" to Plaintiff, and accordingly the discipline would be removed from his record.

58. Afterwards, Wheeler brought Plaintiff into his office again. Wheeler informed Plaintiff that he would bring the Team Leader, Danielle, to assist Plaintiff in reviewing the times Plaintiff punched in and out of Defendant's Hertel location. Wheeler stated that this review of the times Plaintiff punched in would be with Danielle approximately once a week.

59. This review appeared to be a reasonable accommodation.

60. With the exception of one time that Defendant reviewed when Plaintiff punched in and out, these reviews never occurred.

61. The failure of the employer to follow through with this reasonable accommodation was a denial of a reasonable accommodation.

62. At or around the date of March 20, 2015 Plaintiff complained to the Defendant that his pay stubs were no longer being distributed to Plaintiff in a timely manner, and were in fact, missing.

63. Plaintiff required his pay stubs so that he could submit them pursuant to Plaintiff's participation in ACCES-VR, a program that assists disabled individuals.

64. Defendant was aware Plaintiff was a participant in the ACCES-VR program.

65. On March 24, 2015 Plaintiff assisted another DSP in redirecting a participant who was having violent outbursts in the hallway.

66. After that participant hit that DSP, the participant began to alternate between aggressive and calm behaviors.  Accordingly, Plaintiff attempted to calm him.

67. Another Team Leader, John Malark, came into the hallway and loudly stated "that's it" and began to assert himself in a way that antagonized the participant.  The participant began to attempt to hit the other DSP and Plaintiff.

68. Pursuant to Plaintiff's training, Plaintiff moved behind that participant and restrained his arms to keep him from further injuring himself or others.

69. In response, the participant dropped to his knees and then swung his arm to hit Plaintiff in the groin.

70. In a reflexive response, Plaintiff stuck his hands out, with his left hand on the participant's shoulder blade and his right hand towards the participant's elbow, and pushed the participant's swinging arm away from Plaintiff.

71. This move was defensive.

72. Malark yelled "no pushing" at Plaintiff and pointed at Plaintiff.  Plaintiff immediately apologized and said it was a reflex.

73. Malark marched immediately into Wheeler's office and loudly claimed that Plaintiff had abused the participant.

74. Shortly thereafter, the participant was subdued.

75. Wheeler directed Plaintiff into his office where he explained that allegations of abuse required the Defendant to investigate those accusations.

76. Plaintiff asked Wheeler what he was being investigated for, and Wheeler responded that it was for the incident "in the hall."

77. Wheeler also explained that Plaintiff was immediately placed on leave without pay pending the outcome of the investigation.

78. Although Wheeler did not ask what happened, Plaintiff explained what had transpired.

79. Immediately after that discussion, Carla from Quality Assurance asked Plaintiff to tell her what happened.

80. Carla also asked Plaintiff to make a statement, which he did.

81. Plaintiff also expanded on that statement in a writing he made subsequent to that date.

82. Defendant asked Plaintiff to report to work on April 7, 2015.  Present at this meeting were Higgins, Sherri Maynard, Carla, and another person from Quality Assurance.

83. Plaintiff was informed that the investigation returned a finding that the abuse allegation was substantiated and that Plaintiff was terminated immediately.

84. This termination was an adverse action.

85. Plaintiff was given a Summary of Investigation Memo ("Memo") which indicated that the abuse allegation that was being investigated was substantiated.

86. This Memo indicated that the abuse investigation was substantiated because it was alleged that Plaintiff shoved a participant with two hands while the participant was on their knees.  The Memo also stated that "[t]he action was unnecessary to protect the participant's, yours or anyone else's safety and could have resulted in injury to the participant."

87. This Memo also stated that it found additional misconduct during its investigation.  It alleged that Plaintiff's attempts to "get the participant to go back to the classroom were unnecessary and may have contributed to this incident," that Plaintiff had failed "to follow the participant's behavior support plan," that Plaintiff had eaten food in front of the participant, and for failing to support and supervise his assigned participants by being in the hallway dealing with the previously identified participant.

88. Notably, these additional misconduct issues were not identified to Plaintiff in any fashion prior to this disciplinary Memo and his termination, nor was his input sought during the investigation into these claims.

89. At this meeting Plaintiff was additionally given an Employee Discipline Form that indicated, based upon the findings of the Memo, that Plaintiff was terminated and that he had violated Defendant's Code of Business Ethics and Conduct.

90. Plaintiff was alleged to have violated this Code by failing to adhere to the Code and refrain from violation of applicable law relating to the protection of individuals from abuse and mistreatment;

that Plaintiff modeled "inappropriate or unacceptable behavior"; and that he was "loafing" evidenced by his exiting his assigned classroom without approval.

91. Plaintiff denies all allegations of misconduct by Defendant.

92. This investigation was deficient in several material respects that were so egregious to render it beyond a simple abbreviated investigation into a bogus investigation. Notably, the investigation noted the unreliability of the key witness for the accusations of abuse and failed to investigate absolute defenses to misconduct that Plaintiff possessed –and explicitly mentioned in his statement- despite being recognized as defenses by the Defendant.

93. These documents that comprise the investigation reflect a sham investigation. This investigation was an adverse action and was a pretext to terminate Plaintiff based upon Defendant's discriminatory animus.

94. Plaintiff was terminated by the Defendant on this date. Plaintiff was informed that this matter would be further reviewed by the New York State Justice Center.

95. The Justice Center subsequently informed Plaintiff that the allegations were substantiated as Category 3. Notably, Defendant had previously stated in a letter dated March 25, 2015 that substantiated findings of abuse or neglect Category 2 or Category 1 would subject Plaintiff to termination from employment.

96. Therefore, Plaintiff was terminated for a lower level offense.

97. Thus, upon information and belief, Plaintiff was singled out for discipline and termination that is contrary to the Defendant's policy.

98. Upon information and belief, Defendant has not terminated any other employee during Plaintiff's employment period for a substantiated allegation of physical abuse.

99. Upon information and belief, Defendant has terminated a DSP upon Defendant's finding of substantiated allegations of physical abuse that were determined to be unsubstantiated by the Justice Center in July of 2013.

100. Upon information and belief, this singular, disproportionate treatment of the Plaintiff was motivated by a discriminatory animus by the Defendant based upon Plaintiff's disability.

## FIRST CAUSE OF ACTION

### Discrimination in Violation of the Americans With Disabilities Act Amendments Act

101. Plaintiff repeats each and every allegation in the preceding paragraphs as though fully set forth herein.

102. To state a plausible claim for discrimination under the ADAAA, a plaintiff must allege that: (1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability or perceived disability. *Capobiacno v. City of New York*, 422 F.3d 47 (2nd Cir. 2005).

103. As to the first element, Defendant is subject to the Americans with Disabilities Act as it is a private employer that employs greater than fifteen (15) employees.

104. As to the second element, Plaintiff has a disability, has a record of disability, and is perceived to have a disability by the Defendant.   Defendant has acknowledged Plaintiff's disability by granting Plaintiff's requests for accommodation and granting Plaintiff FMLA leave.

105. As to the third element, Plaintiff was and is able to perform the functions of his job with or without a reasonable accommodation.  Plaintiff was employed while he possessed a disability, was accommodated, and continued to perform the essential functions of his job.

106. As to the fourth element, Plaintiff suffered adverse actions because of Defendant's discrimination based on Plaintiff's disability.  Plaintiff was disciplined, denied accommodation, subject to a sham investigation, and terminated based on his disability.

107. Based on the foregoing allegations, Plaintiff states causes of action for discrimination in violation of the Americans With Disabilities Act Amendments Act.

## SECOND CAUSE OF ACTION

### Retaliation in Violation of the Americans with Disabilities Act Amendments Act

108. Plaintiff repeats each and every allegation in the preceding paragraphs as though fully set forth herein.

109. To establish a *prima facie* case for retaliation/opposed discrimination, plaintiff must show that: (1) he engaged in protected activity; (2) the employer was aware of the activity; (3) the employer

took adverse actions; and (4) a causal connection exists between the protected activity and the adverse action. *Cifra v. General Electric Co.,* 252 F.3d 205, 216 (2d Cir. 2001).

110. As to the first element, Plaintiff engaged in protected activity by, among other things, requesting reasonable accommodation from the Defendant and also by taking FMLA leave.

111. As to the second element, the Defendant is aware of said activity as the requests for accommodation and for FMLA leave were made of the Defendant and granted by the same.

112. As to the third element, the Defendant took an adverse action by denying Plaintiff's accommodation and terminating the Plaintiff.

113. As to the fourth element, a causal connection exists between the protected activity and the adverse action, as the denial of accommodation was seven months after his request and specifically referenced his accommodation, and his termination came seven months after his protected activity following a sham investigation.

114. Based on the foregoing allegations, Plaintiff states causes of action for retaliation in violation of the Americans With Disabilities Act Amendments Act.

### THIRD CAUSE OF ACTION

#### Retaliation in Violation of the Family Medical Leave Act

115. Plaintiff repeats each and every allegation in the preceding paragraphs as though fully set forth herein.

116. "In order to make out a prima facie case [of retaliation under the FMLA], [a plaintiff] must establish that: 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza v. City of N.Y.*, 365 F.3d 165, 168 (2nd Cir. 2004).

117. As to the first element, Plaintiff exercised his rights protected under the FMLA by requesting FMLA leave in September of 2014.

118. As to the second element, Plaintiff was qualified for his position which is evidenced by the fact that he was hired and was still working for Defendant immediately prior and subsequent to Plaintiff's request for FMLA leave.

119. As to the third element, Plaintiff suffered an adverse action when Defendant terminated Plaintiff.

120. As to the fourth element, this adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent because of its temporal proximity to the protected action. Plaintiff duly requested FMLA leave and was terminated within seven months of his request following a sham investigation.

121. Based on the foregoing allegations, plaintiff states a cause of action for retaliation in violation of the Family Medical Leave Act.

## FOURTH CAUSE OF ACTION
### Discrimination under 504 of the Rehabilitation Act of 1973

122. Plaintiff repeats each and every allegation in the preceding paragraphs as though fully set forth herein.

123. A cause of action under 504 of the Rehabilitation Act shall be the standards applied under title I of the Americans with Disabilities Act of 1990 [42 U.S.C. § 12111 et seq.] and provisions of sections 501 through 504, and 510 of the Americans with Disabilities Act of 1990 [42 U.S.C. §§ 12201-12204 and 12210], as such sections related to employment. 29 USCS 794(d).

124. Accordingly, to establish a cause of action under 504 of the Rehabilitation Act, a plaintiff must allege that: (1) the defendant is covered by the [statute]; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability or perceived disability. *Capobiacno, supra.*

125. As to the first element, upon information and belief, Defendant receives federal funding in the form of Medicaid.

126. As to the second element, Plaintiff has a disability, has a record of disability, and is perceived to have a disability by the Defendant. Defendant has acknowledged Plaintiff's disability by granting Plaintiff's requests for accommodation and granting Plaintiff FMLA leave.

127. As to the third element, Plaintiff was and is able to perform the functions of his job with or without a reasonable accommodation. Plaintiff was employed while he possessed a disability, was accommodated, and continued to perform the essential functions of his job.

128. As to the fourth element, Plaintiff suffered adverse actions because of Defendant's discrimination based on Plaintiff's disability.  Plaintiff was disciplined, denied accommodation, subject to a sham investigation, and terminated based on his disability.

129. Based on the foregoing allegations, Plaintiff states causes of action for discrimination in violation of the Rehabilitation Act.

## FIFTH CAUSE OF ACTION

### Retaliation under 504 of the Rehabilitation Act of 1973

130. Plaintiff repeats each and every allegation in the preceding paragraphs as though fully set forth herein.

131. To establish a *prima facie* case for retaliation/opposed discrimination, plaintiff must show that: (1) he engaged in protected activity; (2) the employer was aware of the activity; (3) the employer took adverse actions; and (4) a causal connection exists between the protected activity and the adverse action. *Cifra v. General Electric Co.,* 252 F.3d 205, 216 (2d Cir. 2001).

132. As to the first element, Plaintiff engaged in protected activity by, among other things, requesting reasonable accommodation from the Defendant and also by taking FMLA leave.

133. As to the second element, the Defendant is aware of said activity as the requests for accommodation and for FMLA leave were made of the Defendant and granted by the same.

134. As to the third element, the Defendant took an adverse action by denying Plaintiff's accommodation and terminating the Plaintiff.

135. As to the fourth element, a causal connection exists between the protected activity and the adverse action, as the denial of accommodation was seven months after his request and specifically referenced his accommodation, and his termination came seven months after his protected activity following a sham investigation.

136. Based on the foregoing allegations, Plaintiff states causes of action for retaliation in violation of 504 of the Rehabilitation Act of 1973.

**WHEREFORE**, Plaintiff respectfully requests this Court to enter an Order

      A.     Awarding Plaintiff lost salary and benefits in an amount to be determined at trial;

      B.     Awarding Plaintiff damages for his emotional distress in an amount to be determined at trial;

      C.     Defendants to pay Plaintiff the costs of this action, together with reasonable attorneys' fees and disbursements;

      D.     Defendants to pay punitive damages for their intentional violation of plaintiff's rights;

      E.     Injunctive relief as this Court deems just and equitable; and

      F.     Plaintiff to have such other and further relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) Fed. R. Civ. P., Plaintiff hereby demands a trial by jury for all issues triable of right by a jury in this case.

Dated: June 14, 2016
        Buffalo, New York

Respectfully submitted,
Plaintiff Paul O'Sullivan
By his attorney

Lindy Korn, Esq.
*Attorney for Plaintiff*
Law Office of Lindy Korn
Electric Tower
535 Washington Street, Ninth Floor
Buffalo, New York 14203
Telephone: (716) 856-5676
Facsimile: (716) 507-8475
lkorn@lkorn-law.com

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAUL O'SULLIVAN,
                        PLAINTIFF,

                                                    **VERIFICATION**

                vs.

                                                    Civil Action No.

AUTISM SERVICES, INC.

                        DEFENDANTS.

PAUL O'SULLIVAN, under penalty of perjury, deposes and says:

I have read the attached Verified Complaint captioned in this matter and find it to be true to my

knowledge, except as to matters alleged upon information and belief, which I believe to be true.

                                                    PAUL O'SULLIVAN

Sworn before me on this 14u day of June , 2016

Notary Public

WILLIAM F. HARPER
Notary Public, State of New York
Qualified in Erie County
Registration No. 02HA6206409
My Commission Expires May 18, 20 17